1  **RYAN W. STITT**
California State Bar No. 273651
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California 92101-5030
Telephone: (619) 234-8467
4  Facsimile: (619) 687-2666
Ryan_Stitt@fd.org
5
Attorneys for Defendant
6  JERRED BERG

7
UNITED STATES DISTRICT COURT
8
SOUTHERN DISTRICT OF CALIFORNIA
9

10
UNITED STATES OF AMERICA,          CASE NO.:  17CR1751-01-JLS
11
                    Plaintiff,      Hon. Janis L. Sammartino
12                                   Courtroom 4A
          v.                         Date: September 8, 2017
13                                   Time: 1:30 p.m.
    JERRED BERG,
14                                   MEMORANDUM OF POINTS AND
                    Defendant.       AUTHORITIES IN SUPPORT OF MR.
15                                   BERG'S MOTIONS TO SUPPRESS

16

17  **I.    INTRODUCTION**

18        Mr. Berg and Ms. Laidler are charged with importing drugs into the United

19  States.  Ms. Laidler filed a motion to suppress based on a violation of the six-hour

20  rule and because her statement was involuntary.

21        Mr. Berg moves to suppress his statement for three independent reasons:

22  first, the statement was taken more than six hours after arrest and he was not timely

23  presented for arraignment as a result; second, Mr. Berg invoked his right to counsel

24  during questioning; and third, Mr. Berg's statement was involuntary because the

25  agents continued to exert pressure on him and question him after he asserted his

26  right to counsel.

27  **II.   STATEMENT OF FACTS**

28        Jerred Berg and Taylor Laidler entered the United States through the San

1    Ysidro Port of Entry on Tuesday, May 30, 2017, at approximately 1:58 a.m.  *See*

2    Exhibit A, Primary Report.  Customs and Border Protection Officer Orozco

3    reviewed Mr. Berg and Ms. Laidler.  Mr. Berg answered the officer's questions and

4    provided his immigration papers.  *See* Declaration of Mr. Berg, ¶ 4.  Officer Orozco

5    wrote that "[d]uring [his] inspection in primary a box with pills and a green leafy

6    substance with a pipe was found in the vehicle."  *See* Ex. A.  Once the pills and

7    suspected drugs were found, the officer ordered Mr. Berg to exit the car.  *See* Dec.

8    of Mr. Berg, ¶ 5.  The officer next ordered Mr. Berg to place his hands behind his

9    back.  *Id*. at  ¶ 6.  And the officer handcuffed Mr. Berg and led him to an office

10   inside the port of entry.  *Id*. at ¶ 7.

11   When Mr. Berg arrived at the office, the officer removed all of Mr. Berg's

12   possessions from his pockets.  *Id*. at ¶ 9.  Next, the officer inventoried the items

13   including counting Mr. Berg's money.  *Id*. at ¶ 10.  The officers further searched

14   one suitcase and two backpacks from the car.  *Id*. at ¶ 11.  Mr. Berg did not consent

15   to either search.  *Id*. at ¶¶ 12-13.  At this point, Mr. Berg was handcuffed and his

16   possessions were inventoried, he did not feel free to leave.  *Id*. at ¶ 14.  The officer

17   then handcuffed Mr. Berg to a bench in the office.  *Id*. at ¶ 15.  Mr. Berg did not

18   feel free to leave.  *Id*. at ¶ 16.  Several minutes later, the officer took Mr. Berg to a

19   locked detention cell.  *Id*. at ¶ 17.  Mr. Berg did not feel free to leave the locked

20   detention cell.  *Id*. at ¶ 18.  The lights were on in the detention cell, *id*. at ¶ 19, and

21   there was no bed, blanket or pillow.  *Id*. at ¶ 20.

22   While Mr. Berg was in a detention cell, the officers continued their search of

23   the car.  Officer Law reviewed the seized items in the security office and began

24   contacting law enforcement agencies to prosecute the seized drugs.  *See* Exhibit B,

25   Secondary Report.  Officer Law questioned Ms. Laidler and she admitted to

26   possessing .2 grams of methamphetamine and 5.2 grams of marijuana in the car.

27   *Id*.  Officer Law contacted Agent Pham for prosecution and he declined interest.

28   *Id*.   Ms.  Laidler  also  admitted  to  possessing  other  drugs  and  more

1  methamphetamine, ecstasy, and marijuana were found.  *Id*.  Next, Mr. Berg
2  admitted to possessing hydrocodone pills for his back, Viagra pills, and gabapentin
3  pills.  *Id*.  Officer Law contacted Customs Enforcement Unit Officer Luna who
4  declined interest in prosecuting.  *Id*.  Officer Law's report says that the Federal
5  Protective Service responded for interviewing at 8:00 a.m. but no reports, notes, or
6  video of any interrogation has been provided.

7      The search of the car continued at secondary inspection and at about 7:40
8  a.m. Officer Hendee was asked to review Mr. Berg's car with his canine.  *See*
9  Exhibit D, Officer Hendee's Secondary Report.  The dog alerted and the officers
10  found methamphetamine, cocaine, and heroin in the gas tank of the car.  Agent
11  Pham was notified and responded to interrogate Mr. Berg and Ms. Laidler.

12      Agent Pham started by interrogating Mr. Berg and the interrogation began
13  shortly after 11:00 a.m.  Mr. Berg signed a *Miranda* waiver at 11:14 a.m.  *See*
14  Exhibit E, *Miranda* Waiver.  Mr. Berg initially agreed to speak to Agent Pham but
15  he invoked his right to counsel during the interrogation.  A partial transcript of the
16  interrogation is attached as Exhibit F and the complete DVD is attached as Exhibit
17  G.

18      At about minute 22 in the interrogation, Mr. Berg asks for his phone to call
19  his attorney.

20  Berg:        Can I see my phone?
21  CBP Burns:  Yeah, is there a pin on your phone?  They give you an address?
22  Berg:        [nods no.]
23  CBP Burns:  Is there a phone number in there?  What's in your phone that
24              you want to look at?
25  Berg:        I want to talk to my attorney for a minute.  And I also wanted to
26              get a phone number.
27  *See* Ex. F at 11:23-28.
28      The agents do not give Mr. Berg his phone and they continue to question him

3                                    17CR1751-01-JLS

1   about the phone number he wants to get and who his attorney is.  Officer Burns

2   goes on to tell Mr. Berg that he is going to jail and that he is going to ask Ms.

3   Laidler questions after he is done.  *Id*. at 12: 21-24.  Officer Burns continues the

4   interrogation by telling Mr. Berg that there is a point system that judges look at

5   when it comes to sentencing and that they look at whether he took responsibility on

6   the day of arrest and that taking responsibility "counts a lot."  *Id*.  at 12: 26-28 –

7   13: 1-2.  Agent Pham jumps in and says:

8       HSI Pham:      Right, but. . .but if you. . .if you do request an attorney then we

9                      must stop the interview at this time.

10      Berg:          So how do I have the attorney present?

11      CBP Burns:     That's at a later time.  That's after you go to jail and after you

12                     see the judge.  Then, that's how you see the attorney at a later

13                     time.

14      HSI Pham:      This is the only time you will have to speak to us.  So, we want

15                     to give you that option.  I mean you've already told us that there

16                     is a telephone number that we can [inaudible].  So obviously

17                     there is more to the story than what you had originally

18                     mentioned.  We already know that there is no way narcotics can

19                     be put in your vehicle in that amount of time.  With you having

20                     to wait across the border, you coming into Mexico at 10 o'clock,

21                     and. . .

22      CBP Burns:     Yeah. . .

23      HSI Pham:      . . .having some. . .

24      CBP Burns:     . . .first you. . .you were already up front.  You already told the

25                     officer's that the hydrocoral, the .6 grams of Meth, the Ecstasy

26                     that all those things were yours, that you use them for your back

27                     pain.  So that's already been stated to. . .to an officer when you

28                     got here.  And then Taylor took responsibility for the marijuana.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. BERG'S MOTIONS TO
SUPPRESS

1   *Id*. at 13: 14-27.  Mr. Berg continued answering questions and did not mention his

2   attorney again.

3        After finishing Mr. Berg's interrogation, the agents interrogated Ms. Laider.

4   Following that interrogation, an officer went back to Mr. Berg and interrogated in

5   him in cell and elicited a further statement about the drugs found in the car.  *See*

6   Exhibit C., Officer Silva's Supplemental Report.

7        Mr. Berg and Ms. Laidler were not arraigned on Tuesday, May 30th.  Neither

8   name appeared on the no body list for May 30th that the government is ordered to

9   produce to Federal Defenders.  Chief Judge Moskowitz ordered the government to

10  provide a list each day to Federal Defenders of all detainees arrested before 6:00

11  a.m. that will not be present for court that day.[1]  Mr. Berg and Ms. Laidler were

12  arraigned on Wednesday May 31st.

13  **III.  *CORLEY V. UNITED STATES* REQUIRES SUPPRESSION OF MR.
14  BERG'S STATEMENTS BECASE THEY WERE TAKEN MORE
    THAN SIX HOURS AFTER HE WAS TAKEN INTO CUSTODY AND
15  HE WAS NOT TIMELY ARRAIGNED**

16       The government has six hours to conduct an interrogation after a person is

17  taken into custody.  As argued below, Mr. Berg was taken into custody when he

18  was handcuffed, searched, handcuffed to a bench and then locked in a detention

19  cell.  He waited in a detention cell for many hours and his interrogation began over

20  nine hours after he was handcuffed, searched, handcuffed to a bench, and locked in

21  a detention cell.  In addition to being interrogated more than six hours after being

22  taken into custody, the government failed to arraign Mr. Berg without unreasonable

23  delay in violation of Fed. R. Crim. P. 5(a).

24       The *McNabb-Mallory* Rule "generally renders inadmissible confessions

25  made during periods of detention that violate the prompt presentment requirement

26  of Rule 5(a)."  *Corley v. United States*, 556 U.S. 303, 309 (2009) (internal

27

28  _____

[1] *United States v. Lauina et al.*, 15CR1932-BTM, Dk No. 81.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. BERG'S MOTIONS TO
SUPPRESS

1   quotations omitted). An arrested person must be brought "before a judicial officer

2   as quickly as possible so that he may be advised of his rights and so that the issue

3   of probable cause may be promptly determined." *Mallory v. United States*, 354

4   U.S. 449, 454 (1957). "Although the arrestee may be "'booked' by the police[,] he

5   is not to be taken to police headquarters in order to carry out a process of inquiry

6   that lends itself, even it not so designed, to eliciting damaging statements to support

7   the arrest and ultimately his guilt."' *United States v. Pimental*, 755 F.3d 1095, 1100

8   (9th Cir. 2014) (quoting *Mallory*, 354 U.S. at 454). Congress enacted 18 U.S.C. §

9   3501(c) in response to the *McNabb-Mallory* rule and the statute "provides a six-

10  hour 'safe harbor' period during which a confession will not be deemed

11  inadmissible solely because of a delay in presentment to a magistrate."

12      A.    **Mr. Berg Was Taken Into Custody When He Was Handcuffed,
13              Searched, Handcuffed To A Bench, And Locked In A Detention
               Cell**

14      The standard for determining whether a person is under arrest is whether the

15  person feels free to leave and whether a reasonable person under the circumstances

16  would believe that he is being subjected to more than the "temporary detention

17  occasioned by border crossing formalities." *United States v. Butler*, 249 F.3d 1094,

18  1100 (9th Cir. 2001).

19      The Court should be guided by *United States v. Juvenile (RRA-A)*, 229 F.3d

20  737, 743 (9th Cir. 2000). In *RRA-A*, the defendant was a passenger in a vehicle that

21  was referred to secondary inspection for a more intensive search. *Id*. at 743. At the

22  security office, the defendant was frisked and detained in a security office while the

23  officers searched the car. *Id*. at 741. Officers found drugs in the car and then

24  handcuffed the defendant to a bench in a locked security office for four hours until

25  an agent informed her that she was under arrest and advised her of her *Miranda*

26  rights. *Id*. The Ninth Circuit held that the defendant was under arrest when she

27  was handcuffed to the bench in the security office. *Id*. at 743.

28      Mr. Berg's case compels the same result and, in fact, is even more clear

because Mr. Berg was taken to a locked detention cell shortly after being handcuffed to the bench.  Mr. Berg was handcuffed at primary inspection, searches were done of his personal items and bags, he was handcuffed to a bench and then taken to a locked detention cell.  The Court should rule that he was taken into custody, consistent with *RRA-A*, when he was handcuffed to the bench at the security office.

### B.   The Government Failed to Arraign Mr. Berg Without Unreasonable Delay

The officers quickly uncovered the comparatively small amounts of methamphetamine, marijuana, and pills and Officer Law sought prosecution of the case by contacted HSI Agent Pham (who later responded to interrogate the defendants), CEU Luna, and the Federal Protective Service.  *See* Ex. B.  Eventually, the Federal Protective Service said it would respond, *id.*, but no information about that response has been provided.  It is clear that Officer Law believed that a crime had been committed since the officer contacted agencies to prosecute the case.  The only reason to contact a prosecution agency is to prosecute the case, and Ex. B makes clear that Officer Law was seeking to prosecute Mr. Berg for possession of the drugs and pills.  The reality of what happened was that the agents used the delay to search the car further, shop the case for prosecution, and to prepare a more detailed and thorough interrogation of the defendants.  These actions coupled with the delay in presentment compel suppression under § 3501(c).

The Court should look to *Pimental* to determine whether the defendants were presented for arraignment timely under Fed. R. Crim. P. 5(a).  Pimental was arrested at the San Ysidro Port of Entry, the same as Mr. Berg, and he was not timely presented for arraignment.  A dog alerted to Pimental's car at 9:25 a.m., the drugs were found at 10:00 a.m., HSI agents responded and interrogated Pimental at 11:52 a.m., and Pimental was not presented for arraignment on the same day of his arrest.  *Pimental*, 755 F.3d at 1097.  The issue in *Pimental* was whether the defendant

experienced a delay in presentment when he was not presented to court on the same date of his arrest and the Ninth Circuit held that it was unreasonable delay under Rule 5(a) to have not presented him for arraignment on the same day as his arrest. *Id*. at 1103-04.  The delay in *Pimental* was four days but it was a holiday weekend and the Ninth Circuit has previously found that weekend delay is permissible so the question in *Pimental* boiled down to whether Pimental should have been presented on Friday, the same day of his arrest.  The government in *Pimental* argued that the delay was "reasonable because of the need to interview [the defendants] and the need to prepare a complaint before the [defendant] could be taken to a magistrate for his initial hearing."  *Id*. at 1102.  The court rejected this argument and reasoned that the agent's "desire to fully investigate the crime by interrogating [the defendants] was not a valid reason to delay presenting [the defendant] to a magistrate judge."  *Id*. at 1102.

Here, Mr. Berg was taken into custody shortly after being handcuffed at primary inspection and the government knew that a crime was committed shortly thereafter when methamphetamine, marijuana and pills were found in the car.  The additional delay to interrogate Mr. Berg and Ms. Laidler is similar to the agent's actions in *Pimental* when he delayed the presentment so that he could more fully investigate the crime and interrogate the defendant.  Like the defendant in *Pimental*, Mr. Berg was not presented on the day of his arrest in violation of Rule 5(a).  Moreover, Mr. Berg was arrested far earlier than Pimental who was arrested at approximately 10:00 a.m. when drugs were found in his car.  If it is unreasonable delay to fail to present a defendant who was arrested at 10:00 a.m. it is certainly unreasonable to delay Mr. Berg's arraignment until the next day because he was arrested hours earlier and at the same port of entry.

The government delayed questioning Mr. Berg for over six hours after his arrest and it further delayed his presentment unreasonably under Rule 5(a).  The Court should therefore suppress all statements made by Mr. Berg.

## IV.   MR. BERG INVOKED HIS RIGHT TO COUNSEL WHEN HE ASKED TO CALL HIS LAWYER ON THE PHONE

Mr. Berg clearly and unambiguously asked for counsel when he asked to call his attorney on the phone.   The agents then pressured Mr. Berg to change his decision and he then asked how he could have an attorney present during the questioning and the agents told him that he could not at that time.   Mr. Berg's request to call his attorney is a clear invocation, but even if the Court disagrees, Mr. Berg's question about how he can have an attorney present and the agents' answers in context make clear that he was invoking his right to counsel and the agents were pressuring him out of it.   The Court should suppress Mr. Berg's statements after he asked to call his attorney.

To begin with, Mr. Berg was in custody and the agents were asking him questions likely to elicit an incriminating response.   As such, his *Miranda* rights were read to him and he initially waived them. At issue here is whether Mr. Berg later invoked his right to counsel.

The Court in *Davis v. United States*, 512 U.S. 452, 458 (1994) held that "if a suspect requests counsel at any time during [a custodial] interview, he is not [to be] subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."   The invocation must be "unambiguous."   *Id*. at 459.

The Ninth Circuit in *Sessoms v. Grounds*, 776 F.3d 615, 626 (9th Cir. 2015) (en banc) reversed a state conviction in *habeas* proceedings because the state court erroneously ruled that the defendant's statement of "[t]here wouldn't be any possible way that I could have a – a lawyer present while we do this?" was ambiguous under *Davis*.   The holding of *Grounds* is clearly applicable to Mr. Berg's second statement where he says "[how] do I have an attorney present?"   His question makes clear that he is trying to get an attorney and this is an invocation under *Grounds*.

Furthermore, Mr. Berg's initial request to have his phone so that he could call his attorney is a clear and unequivocal invocation of counsel. The court in *Grounds* cited with approval a 7th Circuit case, *United States v. Hunter*, 708 F.3d 938, 948 (7th Cir. 2013), where the court held that a defendant's statement of "[c]an you call my attorney?" was a clear invocation of his right to counsel." *Grounds*, 776 F.3d at 626. There can be no doubt that Mr. Berg was trying to get in contact with his attorney and he asked to speak to him on the phone. This is an invocation of his right to counsel plain and simple.

The Court should further be guided by the pressure applied by the agents after Mr. Berg asked to call his attorney on the phone. This is wholly inappropriate and prohibited under *Davis* which requires all questioning to stop once a suspect invokes his right to counsel. The agents repeatedly referenced the point system relied upon by the Court to impose sentence and told Mr. Berg that the interview was the only time he could speak with the agents and accept responsibility. Moreover, the pressure applied by the agents had the desired effect and he continued speaking with them and answering their questions without a lawyer present and without speaking to a lawyer.

The Court should rule that Mr. Berg's request for counsel was an invocation of his right to counsel and that all questioning after his invocation must be suppressed.

**V.   MR. BERG'S STATEMENT WAS INVOLUNTARILY GIVEN BECAUSE HE WAS HELD FOR HOURS PENDING INTERROGATION, THE AGENT IMPERMISSIBLY REFERENCED AND THE INTERROGATION PROCEEDED AFTER HE REQUESTED AN ATTORNEY**

The Court should suppress Mr. Berg's statement as involuntary in light of the totality of the circumstances.

The government may not implicitly or explicitly communicate to a defendant that exercising her right to remain silent will result in her being punished. In *United States v. Tingle*, the Court held that:

Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.

685 F.2d 1332 n.5 (9th Cir. 1981). The Court in *United States v. Harrison*, 34 F.3d 886, 891-92 (9th Cir. 1994) addressed a "thinly vailed" threat of harsher treatment if Harrison remained silent. The agents presented Harrison with evidence linking her to a crime, told her that she could face up to twenty years in prison, and asked whether it would be better for the judge to know if she cooperated. *See id*. at 890. Harrison then confessed. *See id*.

The government argued that Harrison's statement was voluntary because it was made in her home and not at a police station or jail, that she had two years of college education and had prior experience with the criminal justice system. *See id*. at 891. The Court held that the implied threat of harsher treatment rendered the statement involuntary because even "subtle psychological coercion can effectively overbear a suspect's free will." *See id*. at 892 (quoting *Tingle*, 658 F.2d at 1335)).

At page 10 of Exhibit F Officer Burns told Mr. Berg that:

> [i]t is very important that you are honest because when the judge reads your statement. Ok, and they go through the whole case, they're going to rate you on a point scale, ok? Now points are given for different reasons. Well, let's see what your criminal history looks like. . .[2]

The officer then summarizes Mr. Berg's story and says that: "[s]o this story,

---

[2] *See* Ex. F at 10:8-10.

11

17CR1751-01-JLS

I'm just letting you know, based on my experience this is not a believable story. Nobody is going to read this and buy it as the truth ok?" *Id*. at 10: 21-22. The officer goes on to say "[l]ike I told you about a point scale. Accepting responsibility counts a lot towards your. . .towards what the judge is going to consider ok when it comes down to sentencing an all of that." *Id*. at 12:27-28 – 13:1-2.

The officer's comments run into trouble under *Harrison* because he specifically referenced less punishment, or less points, for accepting responsibility and said that the judge would review Mr. Berg's statement. He then summarized the statement and said that not only in his experience was it not true but that "nobody" would believe it. This is an implicit threat of more time in custody because the officer is saying that the judge would not believe the statement and thus deny Mr. Berg acceptance of responsibility unless he changes his story. The officer emphasized how important accepting responsibility in the eyes of the judge is with the point scale and said it "counts a lot" toward sentencing. The officer's comments, like those in *Harrison*, are impermissible because they implicitly reference more punishment if a statement is not made.

In addition to the implicit threat of more time in custody, the Court should consider:

- Mr. Berg was held for hours prior to interrogation;
- The detention cell had nowhere to sleep comfortably and the lights were on the entire time;
- Mr. Berg was confronted with indicia of guilt;
- He was denied an attorney after requesting one; and
- And the officer confronted him with Ms. Laidler's statements off camera and well after he had invoked his right to counsel.

## VI.   **CONCLUSION**

Mr. Berg requests that the Court suppress his statements because they were taken more than six hours after arrest and he was not timely presented. Further, he

invoked his right to counsel and his statements were involuntary because of the officer's reference to stronger punishment by the judge if he did not change his story.

Respectfully submitted,

Dated:  August 23, 2017          *s/ Ryan W. Stitt*
                                  Federal Defenders of San Diego, Inc.
                                  Attorneys for Defendant
                                  JERRED BERG
                                  Email:  Ryan_Stitt@fd.org

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. BERG'S MOTIONS TO SUPPRESS

## DECLARATION OF JERRED BERG

1.     I Jerred Berg, am the defendant in the above captioned case.

2.     On May 30, 2017 I drove from Tijuana to the San Ysidro Port of Entry in the early morning.

3.     At approximately 1:58 a.m. I arrived at primary inspection.

4.     I provided my immigration documents to the officer and answered the officer's questions.

5.     The officer ordered me to exit the car.

6.     An officer ordered me to put my hands behind my back.

7.     An officer handcuffed me.

8.     I was taken to an office at the port of entry.

9.     At the office, the officer removed all property from my pockets.

10.     The officer reviewed all my property including counting the money in my wallet.

11.     In addition, one suitcase and two backpacks were taken to the office by officers and searched.

12.     I did not consent to the search of my personal belongings.

13.     I did not consent the search of the suitcase and backpacks.

14.     I did not feel free to leave the office.

15.     After searching my personal belongings, the suitcase, and the backpacks, the officer handcuffed me to a bench in the office.

16.     I did not feel free to leave.

17.     Several minutes later, the officer took me to a holding cell and I was locked alone in a detention cell.

18.     I was not free to leave the detention cell.

19.     The detention cell had its lights on the entire time.

//

//

20.     There was no bed, pillow or blanket.


**I state under penalty of perjury that the foregoing is true and correct.**

**Executed on:**  August 17, 2017

By: _____

Jerred Berg

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. BERG'S MOTIONS TO
SUPPRESS