**Index of Exhibits**
***United States v. Berg***
***17CR1751-JLS***

Exhibit A: Officer Orozco's Primary Report .................................................1

Exhibit B: Officer Law's Secondary Report ................................................ 3

Exhibit C: Officer Silva's Supplemental Report ..........................................5

Exhibit D: Officer Hendee's Secondary Report ...........................................7

Exhibit E:  Miranda Form..............................................................................9

Exhibit F:  Partial Transcript of Mr. Berg's Statement ...............................11

Exhibit E:  DVD of Mr. Berg's Statement ..................................................28

# EXHIBIT A




# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security
## Field Operations Office Southern California
## Other Officer Report / Narrative Continuation

NARRATIVE CONTINUATION ☐          REPORT OF OTHER OFFICER INVOLVED IN INCIDENT ☐

DATE: 05/30/2017          DISTRICT & PORT # 2504     SEIZURE # _____

REPORTING OFFICER (NAME/TITLE/AGENCY): OROZCO, F CAR18884          CBPO     OFO

SUBJECT'S NAME: BERG, Jerred Eric          DOB: 08/20/1985

TOPIC: Primary Referral

IOIL NUMBER (IF ANY): _____

On May 30, 2017, at approximately 0158, I was assigned at the SYS POE primary lane 14 when a white Nissan sentra (CA7VZX287) pulled up to my lane. The driver BERG, Jerred Eric (DOB: 08/20/1985) handed me his valid US passport #███9246 and CA DL #██████ The passenger later identified as LAIDLER, Tayler (DOB: 12/13/1998) presented no travel document or ID during the primary inspection. I received two negative declarations and BERG told me he was going to Los Angeles, CA. During my inspection in primary a box with pills and a green leafy substance with a pipe was found in the vehicle. I called for a walk up to my lane and officers responded and escorted BERG and LAIDLER into the security office for further processing. I drove the vehicle into the secondary lot and finished inspecting the vehicle and found baggies with a white crystal like substance which I dropped off at the security office for further processing.

_____  #18884     _____     _____
Reporting Officer / Badge Number          Reviewing Senior / Badge Number          Supervisor / Badge number

# EXHIBIT B

**3**




# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security
### San Diego Field Office
### San Ysidro/Otay Mesa Passenger
### Other Officer Report / Narrative Continuation

| Narrative continuation ☐ | Report of Other Officer Involved in Incident ☒ |
|---|---|

REPORTING OFFICER (Name/Title/Agency):  LAW/A / CBP(O)

Subjects Name:   BERG, Jerred Eric                               DOB:  08/20/1985

Port-of-Entry:   San Ysidro          Date:  05/30/2017

TOPIC:  Meth, Marijuana, Ecstasy and meds seizure

Incident #:   2017-    -    -          FP&F #:   2017-2504-001527-01

IOIL Number (if any):   2016-2504-

(Write in first person: Record observations, statements and behavior, contraband concealment, and other pertinent facts)

On Monday 05/30/2017 at approximately 0400 hours I was working in the Security Office at the San Ysidro POE. I was asked to do a seizure of possible narcotics and medicine. The possible narcotics and medicine belonged to Jerred E BERG (DOB: 08/20/1985) and Tayler L Laidler (DOB: 12/13/1998). I completed field tests resulting in positive results for 0.2gr methamphetamine and 5.2gr marijuana from a bag that LAIDLER admitting to being hers and bringing with her. HSI/SA Pham declined interest at 0445. She then admitted that the drugs were hers as well. I opened the box and conducted positive result test for 1.6gr marijuana, 0.60gr methamphetamine and 49 ecstasy pills. Also contained within the box were 109 hydrocodone pills, 10 Viagra pills and 3 Gabapentin pills that were identified by markings on the pills. BERG acknowledged that the box was his, but stated that all the contents were used for his back pain. I also discovered a bag with a glass pipe and other narcotics paraphernalia. CEU LUNA declined interest at 0715. Federal Protective Service responded for interviewing at 0800. For LAIDLER, the meth and marijuana were seized on DHS form 6051s 2017250400152601-02 respectively. For BERG, the marijuana, hydrocodone, ecstasy, Viagra, meth, gabapentin were seized on DHS form 6051s 20172504152701-06 respectively.

| REPORTING OFFICER/BADGE NO: | SUPERVISOR/BADGE NO: |
|---|---|

000006

**4**

AREA CODE (619) SAN YSIDRO: 690-8800; OTAY MESA: 671-8900

# EXHIBIT C

 

# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security
## San Diego Field Office
### Incident Report

#### San Ysidro/Otay Mesa Passenger

NARRATIVE CONTINUATION ☒          REPORT OF OTHER OFFICER INVOLVED IN INCIDENT ☐

REPORTING OFFICER NAME/TITLE/AGENCY:   **SILVA D./CBPO**

SUBJECTS NAME:   **JARRED BERG**                          DOB:  **08/20/1985**

PORT OF ENTRY:   **2504**          SEIZURE NO:                    DATE:  **05/30/2017**

TOPIC:   **WITNESS**

IOIL NO. (if any)

(Write in first person: identify observations, statements and behavior: contraband concealment: other pertinent facts.)

On 05/30/2017 I was assigned to San Ysidro POE Security Office.  Approximately 1320 I witnessed Berg, Jarred Eric (DOB:08/20/1985) stated that he was going to be paid $6000, once the narcotics were delivered.  HSI Pham/J asked Berg, what type of narcotics was in the vehicle.  Berg stated that it was 40 pounds of meth.

Reporting Officer / Badge Number          Reviewing Senior / Badge Number          Approving Supervisor / Badge number

18088

# EXHIBIT D




## U.S. CUSTOMS AND BORDER PROTECTION
### Department of Homeland Security
### San Diego Field Office
### San Ysidro/Otay Mesa Passenger
### Other Officer Report / Narrative Continuation

| NARRATIVE CONTINUATION ☐ | REPORT OF OTHER OFFICER INVOLVED IN INCIDENT X | | |
|---|---|---|---|
| REPORTING OFFICER NAME/TITLE/AGENCY: | Hendee, Eric/ K-9 Officer /CBP | | |
| SUBJECTS NAME: Berg, Jarred Eric | | DOB: | 08/20/1985 |
| PORT OF ENTRY: San Ysidro | SEIZURE NO: 2017-2504- | DATE | 5/30/2017 |
| TOPIC: Canine Alert | | | |
| IOIL NO. (IF ANY) | | | |

(Write in first person: identify observations, statements and behavior: contraband
concealment: other pertinent facts.)

On 5/3/2017 I was assigned to the San Ysidro POE. At approx. 0740hrs I was asked by CBPO
Rodriguez-Vega, P to screen a white 2015 Nissan Sentra bearing CA/US plates (7VZX287) with
my Human/ Narcotic Detector Dog "Candy" (150088). "Candy" alerted to the underside, and
wheel wells of the vehicle on the passenger side. I notified CBPO Vanmeter of the alert.

_E. Hendee_ 6714

REPORTING OFFICER/BADGE NO:                    SUPERVISOR/BADGE NO:

AREA CODE (619) SAN YSIDRO: 690-8800; OTAY MESA: 671-8900

# EXHIBIT E



**DEPARTMENT OF HOMELAND SECURITY**
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

## STATEMENT OF RIGHTS

Before we ask you any questions, it is my duty to advise you of your rights.

You have the right to remain silent.

Anything you say can be used against you in a court of law, or other proceedings.

You have the right to consult an attorney before making any statement or answering any questions.

You have the right to have an attorney present with you during questioning.

If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

## WAIVER

I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

JERRED BERG
Print Name

_(signature)_
Signature

05/30/17   10:14 am
Date and Time

05/30/17
Date and Time

#8760
Witness

05/30/17   11:14 AM
Date and Time

Witness

# EXHIBIT F

Partial Transcript - Post Arrest Interview
May 30, 2017
*United States v. Jerred Berg*
17CR1751-JLS

JB:            Jerred Berg, Client
HS:            Homeland Security Agent Pham (sp?)
CPB:           Customs and Border Protection Agent Burns

0:00:00:0

HS:      Alright Jerred, so I explained to you a bit ago ok?  I'm Pham (sp?) Homeland Security
         Investigations.

CPB:     Officer Burns with Customs and Border Protection.

HS:      Ok. And I explained to you a bit ago that you are under the arrest for the importation of a
         controlled substance.  Ok?  So prior to asking you any questions about awe your case, I'm
         just right now I'm just going to take some biographical data about yourself ok?

JB:      [Nods yes].

HS:      What's your last name?

JB:      Berg.  B-E-R-G.

HS:      And what's your first name?

JB:      Jerred.  J-E-R-R-E-D.

HS:      Ok.  What's your date of birth?

JB:      August 20, 1985.

HS:      And what's your social security number?

JB:      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.

HS:      Ok.  So ahead and repeat that to me again.

JB:      625…

HS:      Ahuh…

JS:      42-7669.

HS:      Where were you born?  What city and state.

**12**

1    0:01:07.7

2    JB:    Hollywood, California.

3    HS:    What's your current address?

4    JB:    It's…I have my mailing address and an address I reside at.

5    HS:    The one that you reside at.

6    JB:    It's 5225 Blakeslee.  It's B-L-A-K-E-S-L-E-E Avenue.  So, B-L yeah and then it's in
7           North Hollywood, 91601.

8    HS:    Ok.  Do you have any scars?

9    JB:    That's a [inaudible], sorry Unit 216.  Apartment 216.
10

11   HS:    Do you have any scars, tattoos on your body?

12   JB:    I have two tattoos.

13   HS:    Ok, where are they?

14   JB:    One on my wrist and one on my back.

15   HS:    Any scars?
16

17   JB:    Hum, I have a scar on my right ankle from stiches.  I have a scar on my chin from stiches.
            All sport injuries.

18   HS:    What is your telephone number?

19   JB:    909-855-0092.
20

21   HS:    What is your current occupation?

22   JB:    Technician and an Actor.

23   HS:    What kind of technician?

24   JB:    I worked for Apple for five years as a [inaudible], so mainly…

25   HS:    Like are you currently employed by them?

26   JB:    No, I'm currently self-employed and I freelance.
27

28   HS:    Ok, and you said you are an Actor?

2

**13**

1    0:02:59.3

2    JB:    Ahuh.

3    HS:    What is your father's name?

4    JB:    Karsten.  K-A-R-S-T-E-N.

5    HS:    What's his last name?

6    JB:    Berg.

7

8    HS:    And how old is he?

9    JB:    Hum, like sixty something.  Like sixty-five I think.  I don't know his birth year.

10   HS:    Where does he live?

11   JB:    In Downey.  My mailing address is his address.

12

13   HS:    California right?

14   JB:    Ahuh.

15   HS:    What's your mother's name?

16   JB:    Esther.  E-S-T-H-E-R.

17   HS:    What's her last name?

18   JB:    Berg.

19   HS:    And how old is she?

20   JB:    She's 61 I think.

21

22   HS:    And where does she lives?

23   JB:    In Brea, California.

24   HS:    Are you married?

25   JB:    No, I'm not.

26   HS:    Do you have any children?

27   JB:    No.

28

**14**

0:3:53.9

HS:     Ok, give me the name of another relative for emergency purposes.

JB:     Hum…my sister in law.

HS:     Sure.

JB:     [inaudible] N-I-C-L-L-E Berg.

HS:     How old is she?

JB:     Twenty…she was born in '91 so I think she is 25 or 26.

HS:     Where does she lives?

JB:     She lives in…I'm not really sure I think Brea last I heard but I'm not really speaking to her.

HS:     Do you have any money on you?

JB:     Huh yes.

HS:     Can you take it out and count it please?

CBP:    Five 20's, one 10, two 5's, and [inaudible] count your 1's.  Thank you.  One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen 1's.

HS:     137.  Alright Jerred, how's your health?

JB:     Huh.  I mean, it could be…it could be better but it's not horrible.

HS:     Ok, are you…when's the last time you had any drugs in your system?

JB:     Mum, Vicodin.  I had in my system 36 hours ago.  My back.  I was in a car accident in April and I actually have to go…I have an appointment today with my doc but huh, that's just…I have a lot of back pain from that.

HS:     Any other type of drug?

JB:     No.

HS:     What about alcohol.

JB:     I don't drink.

HS:     Ok.  What about any health related issues, besides back pain?

4

**15**

1   JB:    I need to go to the dentist.  That's about it.

2   0:07:08.4

3   HS:    Ok.  So these are your rights ok?  Go ahead and follow along.  I'm going to read to you
4         each line.  If you understand it please signify by saying either yes or no.  Ok?  And then,
         so after each line I'm going to ask if you do understand it please put your initials here.
5         Alright, so ahead and follow along.  Ok.  Hold on.  So before we ask you any questions,
         it's my duty to advise you of your rights.  You have the right to remain silent.  Do you
6         understand?  Say yes or no.

7   JB:    Yes.

8   HS:    Ok.  So if you understand indicate with either yes or no and then put your initials
9         [inaudible].

10  CBP:  You want [inaudible] put this back in his pocket.

11  HS:    Yes.

12  CBP:  You can put it back in your pocket [hands him his cash back].

13  JB:    Then write yes in there?

14  HS:    No, you just put your initials if…is that it?

15

16  JB:    Yeah.

17  HS:    Your initials?  Ok, anything you say can be used against you in a court of law or other
18         proceedings.  Do you understand?

19  JB:    Yes.

20  HS:    Ok.  You have the right to consult an attorney before making any statement or answering
21         any questions.  Do you understand?

22  JB:    Yes.

23  HS:    And then you have the right to have an attorney present with you during questioning.  Do
24         you understand?

25  JB:    Yes.

26  HS:    If you can't afford an attorney, one will be appointed for you before any questioning if
         you wish.  Do you understand?

27

28  JB:    Yeah.

**16**

1   HS:   If you decide to answer questions now you still have the right to stop the questioning
2         anytime or to stop the questioning for the purpose of consulting an attorney.  Do you
        understand?

3   JB:   Yes.

4

5   0:08:48.2

6   HS:   Ok.  So with that in mind, do you want to speak to us?

7   JB:   Hum….yeah.

8   HS:   Ok.  So if you do want to speak to us go ahead and print your name and sign right here
9         please.  Actually before you sign it, go ahead and read the statement out loud and then
10        sign it afterwards.

11  JB:   [inaudible]

12  HS:   Can you read it a bit louder please?

13  JB:   Sorry.  I've read or someone has read to me the statement of my rights and I understand
14        what my rights are at this time.  I am willing to answer questions without a lawyer present.

15  HS:   Ok.  Do you understand that?

16  JB:   Yes.

17  HS:   Ok.  Go ahead and sign it please.  And then the date.  And then it's 10/14…11/14 sorry.
18        Alright Jerred so you came into the United States today.  You had marijuana.  You had
          many different types of pills on you.  There is also narcotics that they had just found, so
19        how much were you going to get paid to bring those into the United States?  We want the
20        truth.

21  JB:   [inaudible] that's not my name.

22  CBP:  Oh.

23  JB:   I wasn't aware of anything.  I'm still…like shocked that you are saying there was other
24        stuff in the car.  I just bought the car a couple days ago but…

25  HS:   How much did you pay for it?

26  JB:   About $2,000 dollars.

27  HS:   That's a very nice car for $2,000 dollars.

28  JB:   [inaudible] it needs work.

6

**17**

CBP:   How long ago did you buy it?

JB:   Three days ago.

CBP:   Three day ago?

HS:   And you paid $2,000 for it?

0:11:25.3

JB:   Yeah.

HS:   Who did you buy it from?

JB:   His first name is Efrain.  I don't remember his last name.

CBP:   Where did you buy it?

JB:   In [inaudible].  Found it on Craigslist.

HS:   So do you have Efrain's number?

JB:   Ahuh, no.  I don't even have my phone.

CBP:   Is it in your phone?

JB:   Trying to remember [inaudible].  Yeah [inaudible].  Might even be on the pink slip.

HS:   So if we went to go talk to Efrain, he is going to tell me that you paid $2,000 dollars for that car.

JB:   Yeah.  The pink slip is in the car.

HS:   So he is going to tell me that you paid $2,000 for it, is that correct?

JB:   Yeah.

HS:   Ok.  So what were you guys doing down in Mexico?

JB:   Taylor had never been out of the Country.

HS:   And how long were you guys down there for?

JB:   Just for the night.

HS:   What time….what time did you drive?  Where were you coming from last night?

**18**

1  JB:    Sorry, can you…

2  HS:    Where did you come down from last night?

3  JB:    Last night?  We came down from North Hollywood?

4  HS:    What time?

5

6  0:13:09.7

7  JB:    Mum, there was a lot of traffic.  I think we got through the border like 10?

8  HS:    Is that last night?

9  JB:    Yeah, and I don't know if it was something that she ate but she wasn't feeling good and
10         we decided just to come back.

11  HS:    Ok.  So what did you do when you were down there?

12  JB:    We huh, got a motel.

13  CBP:   You crossed the border at 10 pm or 10 am?

14  JB:    10 pm.

15  CBP:   And then you got a motel…a hotel?

16  JB:    Motel.  It was like, huh, across there's, in Tijuana there's the Motel [inaudible] but they
17         were full.

18  CBP:   Taylor wasn't feeling well so you got a motel.  What's it called again?

19  JB:    It was across from a motel [inaudible].  It was a bar huh…I can't remember the name.
20         [Inaudible] it was like…it was a weird name.

21  CBP:   And you stayed there for how long?

22  JB:    A couple hours.

23  CBP:   How much did you pay for the hotel?

24  JB:    Twenty-four dollars U.S.  We tried to find [inaudible] also but there just nothing that
25         really was appetizing after that.  I think we stopped at one of those vendor's on the street.

26  CBP:   Why did you get a motel for a couple of hours?

27  JB:    It wasn't…the plan wasn't to get it for a couple of hours.

28

**19**

1   CBP:   Oh.

2   JB:    She wasn't feeling well.  I wasn't feeling well. Decided just to come back.

3   CBP:   You stayed for a couple of hours and then you just left the motel?

4   JB:    Yeah.

5
6       0:14:56.4

7   CBP:   You came back?

8   JB:    Yeah.

9   CBP:   Ok.

10  HS:    So when you entered into Mexico where did you immediately go?

11  JB:    To the motel after we looked for food.

12  HS:    So what did she eat?

13
14  JB:    It was like street tacos.  They were kind of…it was like a cart thing…they were cooking on aluminum foil.  They had like these weird hot dogs things too [inaudible].

15  HS:    So after you ate, where did you go?

16
17  JB:    The motel.

18  HS:    And you were only there for a couple of hours?

19  JB:    Yeah.

20  HS:    So why not, if she was feeling bad, why not spend a lot more time at the hotel to get better
21         driving across the border.

22  JB:    It just seemed like…didn't seem like we wanted to stay there anymore.  We weren't
23         having a good time, weren't feeling well, she wanted to go home.  So…it was one of those ones where you pull in and like there is a garage.  I've never been to anything like that before, and then you just go upstairs.  Kind of weird.

24  CBP:   Do you have [inaudible] memo.
25
26  JB:    Yeah.

27  CBP:   Ok.  Jerred, so this is your first time being arrested here at the Border right?

28  JB:    Correct.

9

**20**

1   CBP:   Ok. So, this is your first time being in here, hum but Agent Pham (sp?) and I do this all
the time hum. Almost every day…you are probably like the third person we talk to today.
2   There's a lot of drugs that come in through here. People try to smuggle people, medicine
so you're not the first person that we've talked to, so I just want to let you know that after
3   this you are going to go to a jail here in San Diego ok. What's today, Tuesday? Then
you are going to go before a judge. The judge is going to read the formal charges against
4   you. Then once the judge talks to you they are

5

0:17:02.9

6

7   going to ask you if you have an attorney. If you don't have one, the government will
provide one for you and then they are going to start telling you what your options are ok?
8   The reason I am explaining all that to you is because we are here to tell your side of the
story. And this being your first time, ok, it is very important, as it being your first time,
9   very important that you are honest because when the judge reads your statement. Ok, and
they go through the whole case, they're going to rate you on a point scale ok? Now points
10   are given for different reasons. Well, let's see what your criminal history looks like. You
were arrested for possession back in 2016 right? So, that's the only thing on your criminal
11   history right now that's going to score you certain points. Then they are going to read
your statements. They are going to look at your story ok? They are going to read that
12   you are cleaning, you bought the car three days ago. That you crossed the border at 10.
That you got a hotel and you stayed for a couple of hours. That Taylor didn't start feeling
13   well so you turned around and came back. Ok? When you came back across they found
Vicodin, marijuana. They found methamphetamine. They found hydrocordone [sp?],
14   Viagra, Galbepintine [sp?] in a box in several different areas in the car, ok?

15

16   JB;   [Inaudible].

17   CBP:   I don't know, three pills that they identified. So, they're going to read that Taylor claimed
that some of it was hers and that you claimed the other stuff was yours for your back pain,
18   ok? Now, you guys have already admitted that the narcotics and the pills belong to you
ok? You've already admitted that and that part, they're going to say cool he was being
19   honest ok? But now there is more drugs in your car. And the way the drugs are in your
car, there's no way that in a matter of two hours of you being in a hotel, someone was
20   able to take your car without you knowing and put those packages inside of your car in
the place that they were in, and for you to turn around and come back. So this story, I'm
21   just letting you know, based on my experience this is not a believable story. Nobody is
going to read this and buy it as the truth ok? Because I will tell you how it works. The
22   way it works in Mexico is people contract you. So, they know you are a U.S. Citizen,
they know you need money. Most people do this because they need money or they do it
23   because a family member has done it before and gotten away with it, and it's quick money
and they will tell you it's easy, don't worry about it, they're not going to detect it, it's
24   easy money for you. So, they find people like you and Taylor to go and do this. They will
give you a car—don't' even worry about it, we will provide the car. All you need to do
25   is drive across, ok? These people tell you to take it to a certain location and then from
that location they take the car from you. They take the drugs and they're like hey if you
26   do it three times and you get across, you get to keep the car. Don't even worry about it.
Do you see what I'm saying? So, I want to give you another opportunity to be honest

27

28

**21**

because this is the only chance that you are going to get to tell the truth ok?  After that you won't get that chance anymore and it's important for you as this being your first time, that you be up front and honest to help yourself from, ok?  So this is now your life.  This is now you in this office.  The people who used you, because that's what they do.  They use people like you and Taylor ok?  We know that the drugs were not yours.  The one's that were concealed in your vehicle.  We know those belong to somebody else.  So, we aren't interested so much in you but in the people who are providing you with those drugs, providing everyone else that crosses through with the drugs.  That is who we are really after ok?  So then right now, this is for you to take care of yourself ok?  And it's your first time.  You're…how old are you?

0:21:30.3

JB:    31.

CBP:    You're a young guy.  Taylor just turned 18 right?

JB:    Yeah last December.

CBP:    She is a young girl.  This is your first arrest here at the border ok?  So, I just…I want you to take care of yourself right now.  Please do what is in your best interest ok?  And what's in your best interest is to be completely honest.  You know what, they were going to pay me this amount, I was supposed to take it to such and such place and that's it.  And if you now any other information that can help us, you know this person called me, I was supposed to call them as soon as I crossed, the number is in my phone.  If you can provide any other type of information, if it's people that you know and you don't want to give their names that's fine, ok?  I understand that. Sometimes it's friends that got you into it. I am not asking you to rat out your friends but I am asking you to help yourself by being honest ok?  We have over ten years doing this, so I know what you are trying to do.  I know it's scary.  I know it's your first time.  I understand all that but right now, this is your life.  Those people, they forgot about you already.  They are going on to the next Justin….Jerred.  They're already contracting the next guy that they are going to use to do this ok?  But you're here right now ok?  Do you want to take care of yourself right now by being honest? Where were you going to take the car?  Where did they tell you to take the car?

    [SILENCE]

JB:    Can I see my phone?

CBP:    Yeah, is there a pin on your phone?  They give you an address?

JB:    [nods no].

CBP:    Is there a phone number in there?  What's in your phone that you want to look at?

JB:    I want to talk to my attorney for a minute.  And I also wanted to get a phone number.

11

**22**

1    CBP:   Ok.  Who is your attorney?

2    JB:     Hum, well there's my bail bonds guy and the attorney that he [inaudible].

3    CBP:   Ok, so your bail bonds man referred you to an attorney?

4    JB:     Ahuh.

5    CBP:   And then you said that you want to give us another phone number?  What's that phone

6          number?

7    JB:     It's a phone number you want.

8    CBP:   A phone number we want?

9

0:245:32.0

10

11   JB:     [nods yes].

12   CBP:   Ok, so right now, do you want to continue speaking with us after you give me that number

13         or you  want to request an attorney [inaudible]?

14   JB:     I want to continue speaking with you [inaudible].  Also, kind of want to know what my

15         options      are.

16   CBP:   What your options are—as far as what?

17   JB:     [Inaudible].

18   CBP:   [takes a phone out from back pocket and scrolls through it]…[inaudible]

19   JB:     What happens to me [inaudible]?

20

21   CBP:   So what happens, like I told you, we are going to talk to Taylor right now, and we are

             going to ask   her to go through the same process that we are going with, with you. Hum,

22         but so basically what  happens is from here you go to jail in San Diego.  Then from there

             you are going to go before a   judge and the judge is going to say ok, Jerred Berg you have

23         been arrested, this and this.  This is   the charge against you.  Do you have an attorney?

             If you say yes, ok then they give you time to set up with your attorney and then you come

24         back and see them.  They could possibly…

25   JB:     Can I post bail?

26   CBP:   …possibly.  It all depends but that is set at a later time.  So then once you talk to your

27         attorney, the attorney is the one who tells you what all your options are ok?  But one

             of the things that they look at is are you taking responsibility for what happened today.

28         Like I told you about a point scale.   Accepting  responsibility  counts  a  lot  towards

**23**

1   your…towards what the judge is going to     consider ok when it comes down to
2   sentencing and all of that.  So that's one of the big    considerations [person walks in for a
    moment and leaves].    Is this your phone?

3   JB:    Yes.

4   CBP:    Ok.  Place it right here when you unlock it ok?

5   HS:    Ok, so do you want to continue speaking to us?  Cause we have to be clear on that.

6

7   JB:    I want can I talk to my attorney first and then decide?

8   HS:    No…

9   CBP:    No.  You have to decide first.

10   JB:    Because you said that I can…

11

12   0:26:51.0

13   [Inaudible - overlapping voices of all three].

14   HS:    Right, but…but if you…if you do request an attorney then we must stop the interview at
15       this time.

16   JB:    So how do I have the attorney present?

17   CBP:    That's at the later time.  That's after you go to jail and after you see the judge.  Then,
18       that's how     you see the attorney at a later time.

19   HS:    This is the only time that you will have to speak to us.  So, we do want to give you that
20       option.  I mean you've already told us that there is a telephone number there that we can
        [inaudible].    So obviously there is more to the story then what you had originally
21       mentioned.  We already know that there is no way narcotics can be put in your vehicle in
        that amount of time.  With you having to wait across the border, you coming into Mexico
22       at 10 o'clock, and…

23   CBP:    Yeah…

24   HS:    …having some…

25   CBP:    …first you…you were already up front.   You already told the officer's that the
26       hydrocordal, the .6 grams of Meth, the Ecstasy that all those things were yours, that you
        use them for your back pain.  So that's already been stated to…to an officer when you got
27       here.  And then Taylor already took responsibility for the marijuana.

28   JB:    [Inaudible] we were only there for a couple hours.

13

**24**

1     HS:     Ok, so…

2     CBP:     Yeah, I understand that but we're…

3     JB:     I took the car for only an hour and a half.

4     HS:     Ok.

5     CBP:     Ok.  So how much were they going to pay you to bring the car across and where were you

6              taking  it?

7     JB:     I didn't have locations [inaudible] map.

8     CBP:     They were going to tell you later?

9     JB:     Ahuh [nods yes].

10     CBP:     They were going to call you or text and tell you the location later?

11     JB:     Yeah.

12

13     0:28:33.6

14     CBP:     And this person that you were speaking to was?

15     JB:     [Inaudible]

16     CBP:     Well what was….what was the nickname?  What would people call him?

17     JB:     I'm trying to remember.

18

19     HS:     Do you remember how much they were going to pay you?

20     JB:     They weren't really going to pay me money.  I was going to be [inaudible] made some

21              threats against Taylor and I prior to that and I was going to get to keep the car and I needed
                a car and…

22     HS:     So they were going to give you the car?

23     CBP:     Ok.

24     JB:     [Inaudible]

25     CBP:     They were going to give you the car if you did it one time, three times, five times?

26

27     JB:     [Raises index finger indicating one while he nods his head].

28     CBP:     Just one time?

**25**

1   JB:      [Nods yes].

2   CBP:    Ok.  Did they tell you what was inside?

3   JB:      [Nods no].  No, they said they would take it for a couple of hours.

4   CBP:    They said they would take it?

5   JB:      And then I should drive it back…

6   CBP:    Ahuh…

7   JB:      …and they [inaudible].

8   CBP:    Ok, so you were supposed to drive it across, then you were going to call this number and be like hey I'm across and they were going to be like ok go here.  Did they give you an idea of where you would go?

9   JB:      Originally it was supposed to be back up in L.A. but they [inaudible] they keep changing the plans and it's really hard to understand what they are saying.  It sounded like they were going to meet maybe in San Diego.

0:30:19.4

CBP:    Ok.  So originally, you were going to drive it all the way to L.A.  Ok, because normally for people to drive it all the way to L.A. they pay them a lot more money because you got to go through Camp Pendleton.  There's like a lot more check points.

JB:      Ahuh.

CBP:    So besides the car, did they tell you that they were going to give you more if you drove it all the way to L.A.?

JB:      [Nods no].

CBP:    It was just for the car?

JB:      [Nods yes] and for the safety.

CBP:    For the car and the safety?  What do you mean by that?

JB:      Like we had been threatened [inaudible] prior to that.

CBP:    How?  How did you meet them?

JB:      Taylor and I had a little purchase from them previously in the past.

HS:      What kind of purchase?

**26**

JB:      Of drugs.

HS:      And where is that at?

JB:      Well…

HS:      In the United States or Mexico?

JB:      In the United States.  And they…they didn't actually come through on the deal.  They stole from us…

CBP:    Oh….

JB:      …and it got really nasty.

CBP:    What do you mean by it got really nasty?

JB:      Like [inaudible] threats they were making.

CBP:    So how did you meet them though?

0:31:31.4

Video continues

**27**

# EXHIBIT G

# (DVD Hand-delivered)